RANKIN (JOLLY v.). See Case No. 7,440.
RANKIN (SHOOK v.). See Cases Nos. 12,804 and 12,805.

---

## Case No. 11,568.

RANKIN v. THIRD NAT. BANK et al.

[14 N. B. R. 4;[1] 3 Cent. Law J. 156.]

Circuit Court, E. D. Missouri. Jan., 1876.

BANKRUPTCY—ILLEGAL PREFERENCE—KNOWLEDGE OF CREDITOR.

A creditor who had no reasonable cause to believe the debtor insolvent at the time of receiving security may hold it as against the assignee.

[Appeal from the district court of the United States for the Eastern district of Missouri.]

Bill in equity by [Thomas Rankin] the assignee in bankruptcy of Robert Rankin, filed in the district court in November, 1874, against the Third National Bank and others, to set aside an alleged fraudulent preference made by the bankrupt to the bank, within four months of the bankruptcy proceedings. Upon the pleadings and proofs, the district court dismissed the bill [case unreported], and the assignee appeals.

G. M. Stewart, for assignee.
J. O. Broadhead, E. T. Allen, and N. Myers, for defendants.

DILLON, Circuit Judge. I have read the voluminous proofs in this case, and assuming, without deciding (which is the most favorable to the plaintiff), that the amended bankrupt act does not apply to the case, though brought after it took effect, I am of opinion that the decree of the district court dismissing the bill was correct. In this view of the case there is no disputed proposition of law, and the cause turns wholly upon the facts. It is not expedient to review the eight hundred pages of evidence. It could not satisfactorily be done within a reasonable compass. It must suffice to state generally the conclusions reached. The bank, September 20, 1873, held the notes of Dawes & Co. for twenty-five thousand five hundred dollars, indorsed by

[1] [Reprinted from 14 N. B. R. 4, by permission.]

the bankrupt, Rankin. There were pledged as security for this debt to the bank, and had been since the creation of the debt in 1872, notes on the Chester and Tamaroa Railroad Company for a like amount, and first mortgage bonds of the same railroad company for thirty-eight thousand dollars. The bonds were issued at the rate of sixteen thousand dollars per mile, and the railroad upon which they were secured was completed and in operation. The proofs show that when the loan was made of the bank, and down, at least, to the panic, which commenced September 18, 1873, the bonds were worth and could probably have been sold for an amount equal to the debt. Jay Cooke & Co. failed September 18, 1873, and this was the immediate occasion of what is called the panic of that year. The effect of the panic was soon felt in the depreciation, or rather, the salability of railway stocks and securities, and there was a very general sense of uneasiness and alarm in financial and commercial circles throughout the country. When the panic would end, and how general it would become, it was difficult to foresee. On the 23d day of September, 1873, about half of the debt to the bank would mature, and in thirty days more the residue. Dawes & Co., the makers, were non-residents, and the bank looked largely to Rankin and the collateral notes and bonds for security and payment. Rankin wished to renew, and the bank declined, unless further security was given. Accordingly, on September 20, 1873, Rankin executed his note for twenty-five thousand five hundred dollars, payable in one year, and secured the same by a deed of trust upon real estate, which was recorded. This note was made payable to Rogers, one of the defendants, and the deed of trust made to the defendant, Jackson, as trustee. Subsequently, October 30, the defendant, Rogers, claims to have loaned Rankin twenty-five thousand dollars, which was paid to the bank, and all the collaterals and securities held by the bank were turned over by the direction of Rankin to Rogers, who thus stepped into the shoes of the bank. It is insisted by the assignee in bankruptcy, that this transaction of October 30 is only colorable, and was made to evade and defeat the bankrupt act [of 1867 (14 Stat. 517)], but, if it was not made with this view, nevertheless the bank cannot, the assignee insists, hold the money it received on that day, because it then knew that Rankin was insolvent and in contemplation of bankruptcy. I do not consider it necessary to determine between these conflicting claims as to the transaction of the 30th of October. I am of opinion that the rights of the bank as to the deed of trust depend upon the effect of the transactions of September 20, when that security was taken. It is sought to impeach this security on the ground that it was received in violation of section 35 of the bankrupt act. In other words, it is insisted that

Rankin was then insolvent, and that the deed of trust was made and received with a view to give the bank a preference, it having reasonable cause to believe Rankin was insolvent, and that the deed of trust was in fraud of the bankrupt act. But the proof is clear that in point of fact the bank or its managing officers did not believe Rankin to be insolvent. Rankin did not believe himself to be insolvent, but worth at least one hundred thousand dollars. The proof satisfies my mind that there was nothing brought to the attention of the bank or its officers which would reasonably have induced the belief that Rankin was insolvent. This security was taken only two days after the panic set in, and when Rankin and the bank officers believed it would be but temporary. It was taken to bridge over the panic. Rankin's debt was about to mature. The bank had the right to make an immediate sale of the railroad bonds held as collateral. This would have been attended, as Rankin supposed, with great sacrifice, in the then condition of the market and the existing feeling with reference to railroad securities, and he wished to avoid this by an extension. If the bank carried the debt, they wished further security, and would not do so unless they obtained it. Rankin offered, and was willing to give it. Although testifying in the interest of the assignee, Rankin states that he had no idea he was then insolvent or that he was in danger of bankruptcy, or that he contemplated it as then possible. From his evidence and that of Lionberger, the president, and Jackson, the vice-president of the bank, it is plain beyond question that such a thing as the bankruptcy of Rankin was not in the view of any of the parties on the 20th day of September.

For these reasons the action must fail. Ordinarily a man's banker is of almost all persons the one best acquainted with his financial condition, and securities taken from a customer who soon afterwards becomes insolvent should be scrutinized with care. I have not been unmindful of this in my examination of the evidence; but the case is hardly one for the application of this cautionary rule, since the bank here was not the general banker of the bankrupt, and had but comparatively few transactions with him. Affirmed.